EDMUND G. BROWN JR.
Attorney General of the State of California
TOM GREENE
  Chief Assistant Attorney General
THEODORA BERGER
  Senior Assistant Attorney General
SALLY KNOX
  Supervising Deputy Attorney General
CHRISTOPHER CROOK (S.B. # 50339)
KIRK McINNIS (S.B. # 130952)
TIMOTHY E. SULLIVAN (S.B. # 197054)
Deputy Attorneys General
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 622-4038
  Fax:  (510) 622-2270
  Email:  Timothy.Sullivan@doj.ca.gov
Attorneys for Plaintiff California Department of Toxic
Substances Control

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL,**<br><br>Plaintiff,<br><br>v.<br><br>**PAYLESS CLEANERS, et al.,**<br><br>Defendants. | Civ.S-02-2389 LKK DAD<br><br>**SETTLEMENT AGREEMENT AND CONSENT DECREE BETWEEN DTSC AND CALIFORNIA WATER SERVICE COMPANY** |

## INTRODUCTION

Plaintiff, the California Department of Toxic Substances Control ("DTSC"), filed a

second amended complaint on December 8, 2004, (the "Complaint") in the United States District

Court for the Eastern District of California (the "Court"), pursuant to the Comprehensive

Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et

seq., and California state law governing release of hazardous substances and nuisance.

The Court, on the motion and with the consent of DTSC and California Water Service

Company, Inc. ("Cal Water"), hereby ORDERS, ADJUDGES, AND DECREES as follows:

1. **DEFINITIONS**

 A. All terms used in this Consent Decree that are defined in section 101 of CERCLA, 42 U.S.C. § 9601, shall have the same meaning set forth in that section.

 B. "DTSC," as used in this Consent Decree, shall mean DTSC, its predecessors including, but not limited to, the Toxic Substances Control Program of the State of California Department of Health Services, and its successors.

 C. "Southwest Chico Plume" means both the soil and groundwater existing in the shallow, intermediate, and/or lower aquifers underlying the city of Chico south of Big Chico Creek that are contaminated with perchloroethylene (including its breakdown products), the area of which is roughly represented by Figure 2 of the "Groundwater Monitoring Report, Third Quarter 2006, Chico Southwest Plume, Chico, California," dated October 20, 2006 (attached hereto as Exhibit A and incorporated herein by this reference), and all locations where such contaminants may come to be located.

 D. "Response Costs," as used in this Consent Decree, shall include all costs of any type or character whatsoever, including but not limited to costs related to "removal," "remedial action," or "response" (as those terms are defined by section 101 of CERCLA), incurred or to be incurred by DTSC in response to the release or threatened release of hazardous substances at, in, or from the Southwest Chico Plume. Said term shall include, but not be limited to, direct labor costs; contractor, consultant and expert costs; travel and any other out-of-pocket expenses; the costs of identifying, developing evidence against, and pursuing claims against persons or entities liable for the release or threatened release of hazardous substances at, in, or from the Southwest Chico Plume; indirect costs; oversight costs; applicable interest charges; and attorneys' fees.

 E. "Remedial Action Plan," as used in this Consent Decree, shall mean a remedial action plan prepared to address the release or threatened release of hazardous substances at, in, or from the Southwest Chico Plume and finally approved by DTSC as described in California Health and Safety Code section 25356.1, and also includes any amendments to the remedial action plan that are subsequently approved by DTSC.

F.     "Potential Remedy" means a remedial action to address contamination at, in, or from the Chico Southwest Plume that includes the following measures: (1) The pumping and treatment of water from up to three wells: one existing well, known as CWS-46; and one or two new wells to be installed in the Chico Southwest Plume to the southwest of CWS-46 (hereinafter referred to as "Future Well A" and "Future Well B"); (2) Periodic monitoring of groundwater from numerous groundwater monitoring wells previously installed or to be installed; and (3) Continuation of the above activities for a period of at least 30 years or until contaminants of concern are no longer detected.

G.     "Future Remedial Extraction Wells" means the one or two new wells that, depending on the requirements of the Remedial Action Plan, may be installed in the Chico Southwest Plume to the southwest of CWS-46, which are referred to herein as Future Well A and Future Well B, or any wells constructed to replace those wells.

H.     "Future Treatment System" means a granular activated carbon filtration system intended to remove perchloroethylene from the Future Remedial Extraction Wells, if such a system is required by the Remedial Action Plan, or any future treatment device that replaces the system and serves the same purpose in the Remedial Action Plan.  The Future Treatment System is expected to include two granular activated carbon filtration units (2,000 to 6,000 pounds each) operated in series that are designed to treat to drinking water standards approximately 100 gallons per minute of water.

I.     "Central Plume Wells" means wells anticipated to be pumped as part of a remedial action plan for the Chico Central Plume groundwater remediation that have been designated as CMW-101B, CMW-117B, CEW-1, CMW-118B, and CMW-119B (or any wells constructed to replace those wells) and also wells owned by Cal Water known as CWS-21 and CWS-8.  Except as otherwise explained herein, Cal Water's obligations with respect to the Central Plume Wells are contained in a separate Consent Decree and Settlement Agreement between DTSC and Cal Water settling the Central Plume litigation (*California Department of Toxic Substances Control v. City of Chico, et al.* [U.S. District Court, Eastern District of California, Case No. Civ.S-02-0442 LKK DAD]); that Consent Decree and Settlement Agreement was approved by the Court and entered on May 23, 2007.

J.     "Effective Date" is the day on which this Consent Decree is entered as an order of the Court.

**2.     <u>RECITALS</u>**

A.     DTSC is the California state agency with primary jurisdiction over the response to the release and threatened release of hazardous substances at, in, or from the Southwest Chico Plume.

B.     DTSC seeks to recover from all defendants named in the Complaint, including but not limited to Cal Water, jointly and severally, all costs it has incurred in response to releases and/or threatened releases of hazardous substances at, in, or from the Southwest Chico Plume, pursuant to section 107(a) of CERCLA. DTSC also seeks a declaratory judgment that all such defendants are jointly and severally liable for all additional costs incurred by DTSC in response to the releases and/or threatened releases of hazardous substances at, in, or from the Southwest Chico Plume pursuant to section 113(g)(2) of CERCLA, 42 U.S.C. section 9613(g)(2). DTSC alleges that it will continue to incur Response Costs until the remedy selected in the Remedial Action Plan, and operation and maintenance of that remedy, is completed. DTSC also seeks injunctive relief to abate a public nuisance (California Health and Safety Code § 58009) and to abate an imminent or substantial endangerment to public health and safety or to the environment (California Health and Safety Code § 25358.3).

C.     By entering into this Consent Decree, Cal Water expressly denies any liability whatsoever for any of the claims made in the Complaint and under any of the authorities stated in the Complaint, and makes no admission of liability. DTSC has not contended in this lawsuit that Cal Water was responsible for initially introducing any amount of perchloroethylene or any other contaminant into the groundwater or soils in the Southwest Chico Plume. DTSC acknowledges that Cal Water first identified the perchloroethylene problem in the Southwest Chico Plume pursuant to monitoring required under AB 1803 (ch. 881, Stats. 1983) and cooperated with authorities in investigating the problem.

D.     Each of the parties to this Consent Decree represents and acknowledges that, in deciding whether to enter into this Consent Decree, it has not relied on any statement of fact,

statement of opinion, or representation, express or implied, made by any other party to this Consent Decree. Each of the parties to this Consent Decree has investigated the subject matter of this Consent Decree to the extent necessary to make a rational and informed decision to execute it, and has had the opportunity to consult independent counsel.

E.      DTSC and Cal Water agree that settlement without further litigation and without the admission or adjudication of any issue of fact or law is the most appropriate means of resolving this action. This Consent Decree was negotiated and executed by DTSC and Cal Water in good faith to avoid prolonged and complicated litigation. DTSC and Cal Water, moreover, have negotiated and executed this Consent Decree to further the public interest and to protect human health and the environment.

**3.      JURISDICTION**

This Court has jurisdiction over DTSC's federal law claims, which arise under CERCLA, pursuant to 28 U.S.C. section 1331 and 42 U.S.C. section 9613(b). This Court has jurisdiction over DTSC's state law claims under the supplemental jurisdiction provision of 28 U.S.C. section 1367(a) and under 28 U.S.C. section 2201, in that the state and federal claims arise from common facts relating to release of hazardous substances and remediation of or failure to remediate the resulting contamination. This Court has personal jurisdiction over each of the parties to this Consent Decree. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. section 1391(b) and 42 U.S.C. section 9613(b). This Court, further, has the authority to enter this Consent Decree as a consent decree of the Court.

**4.      SETTLEMENT OF DISPUTED CLAIMS**

4.1      This Consent Decree represents a fair, reasonable, and equitable settlement of the matters addressed herein.

4.2      For the purposes of this Consent Decree, Cal Water admits none of the allegations of the Complaint. Nothing in this Consent Decree shall be construed as an admission of any issue of law or fact or of any violation of law. Notwithstanding the foregoing, Cal Water acknowledges that it has agreed to perform certain acts and further acknowledges its responsibility pursuant to this Consent Decree to perform those acts it has agreed to undertake in this Consent Decree, and shall

1  not deny such responsibility in any proceeding brought by DTSC to enforce this Consent Decree.

2      4.3     Except as set forth in section 9 of this Consent Decree, nothing in this Consent

3  Decree shall prejudice, waive, or impair any right, remedy or defense that Cal Water may have in

4  any other or further legal proceeding.

5  **5.     WORK TO BE PERFORMED BY CAL WATER**

6      In exchange for the covenant not to sue contained in this Consent Decree, Cal Water agrees

7  to provide to DTSC the planning, engineering, design, construction, and equipment listed below

8  in sections 5.1, 5.2, 5.3, and 5.4, for the purposes of implementing a remedial action to address

9  releases of hazardous substances.

10     5.0     Recitals

11         5-A     Cal Water currently owns and operates a well known as CWS-46, the

12  water in which has been contaminated with perchloroethylene.  Cal Water treats the water from

13  this well and provides it to its water customers in the city of Chico pursuant to a permit issued by

14  Department of Health Services ("DHS").

15         5-B.     The Potential Remedy for the Southwest Chico Plume includes the pumping

16  and treatment of water from up to three wells, known as Future Well A, Future Well B, and CWS-

17  46.  When construction of the Future Treatment System is completed, the Future Remedial

18  Extraction Wells will be connected to the Future Treatment System; well CWS-46 has its own

19  separate treatment unit.  The location of well CWS-46 is shown on Exhibit A.  The parties

20  anticipate that Future Well A and Future Well B will be located to the southwest of CWS-46,

21  north of Little Chico Creek.

22         5-C.     As detailed below, Cal Water will retain contractors and design

23  professionals to design and install certain capital improvements included in the Potential

24  Remedy.  Cal Water will provide for the construction of those specified capital improvements at

25  its expense but subject to a cost cap discussed elsewhere herein.  Any new extraction wells,

26  including Future Well A and Future Well B, as well as any new monitoring wells, are excluded

27  from the capital improvements to be designed and installed by Cal Water, except as otherwise

28  specified in section 5.1(a)(7).  Capital improvements related to site closure are also excluded

from the work to be performed by Cal Water.

5-D.    As detailed below, Cal Water will provide certain operation and maintenance for the Potential Remedy at its expense over a 30 year period, or until DTSC has determined that the remediation is complete, whichever is earlier.  Cal Water will provide labor and utilities at its own expense, but parts are excluded.  Cal Water will perform at its own expense influent and effluent EPA standard 8260B or equivalent sampling and analysis once per month, or similar sampling as needed to meet DHS monitoring requirements, at each of the Remedial Extraction Wells, the Future Treatment System, and well CWS-46.  Cal Water is not required by this Consent Decree to perform any sampling or analysis of groundwater monitoring wells, including, but not limited to, well purging, sample collection, analytical costs, data analysis, hazardous waste disposal fees, or temporary storage.

5-E.    As of the signing of this Consent Decree, DTSC has not approved a remedy for the Southwest Chico Plume, nor has it approved a Remedial Action Plan.  The amount, nature, and extent of work to be performed by Cal Water pursuant to this Consent Decree shall not be expanded due to any differences between the Potential Remedy and the remedy ultimately selected in the approved Remedial Action Plan.

5.1.    <u>Design and Construction of Remedial Measures</u>.

(a)    Cal Water will hire design professionals and contractors, as necessary, to complete the following elements of the Potential Remedy (excluding design and construction of Future Well A and Future Well B, and any new monitoring wells, except as otherwise specified in section 5.1(a)(7)), to be defined in the Remedial Design, at its own expense but subject to the Cost Cap described in section 5.1(b) below:

(1)  Planning for new construction necessary to implement the Potential Remedy as follows:

(A)    Designing the Future Treatment System;

(B)    Designing pipelines for transmission mains from the Future Remedial Extraction Wells to the Future Treatment System and applicable station piping and

from the Future Treatment System to Cal Water's distribution system pursuant to specifications attached hereto as Exhibits B, C, D, and E;

(C) Coordinating activities among parties conducting work;

(D) Acquiring use permits, building permits, encroachment permits for work in rights of way, electrical permits, and DHS permit amendments, including preparation and submittal of applications for permits;

(E) Negotiation of access rights or agreements, if necessary, as an agent on behalf of DTSC when authorized in writing by DTSC to do so. Consideration, payments, costs or expenses, including attorney's fees, related to the acquisition of real property, eminent domain, licenses, leases, easements, construction easements, rights of entry or access rights shall not be borne by Cal Water.

(2) Designing the Potential Remedy as follows:

(A) Preparing construction drawings for pipeline design and Future Treatment System design;

(B) Preparing the electrical design for the operation of pumps and motor transporting water from the Future Remedial Extraction Wells to the Future Treatment System and from the Future Treatment System to Cal Water's distribution system;

(C) Preparing the concrete pad design to the requirements of the City of Chico Building Department standards;

(D) Preparing technical specifications for the pipelines, granular activated carbon units, and all electrical components to operate the fixtures;

(E) Selecting equipment for the pump and motors as well as electrical equipment directly in connection with the operation of the mechanical equipment;

(F) Preparation of bid packages, including a notice to bidders, newspaper publication (if necessary), special conditions, drawings and/or specifications, a non-collusion affidavit form, bid and/or performance bond forms and the terms and conditions for construction agreements, which shall be exclusively determined by Cal Water.

1         (3)      Procuring and installing the granular activated carbon filtration

2 units and associated piping that will make up the Future Treatment System, pursuant to

3 specifications substantially similar to those attached hereto as Exhibit F. Cal Water will provide

4 the initial supply of carbon filter media for the granular activated carbon filtration units, but Cal

5 Water shall not be responsible for the cost of carbon filter media used to treat water passing

6 through the Future Treatment System. Cal Water shall not be responsible for the cost of carbon

7 filter media after the initial supply of said media.

8         (4)      Procuring and installing underground conveyance pipelines

9 between the Future Treatment System and each of the Future Remedial Extraction Wells and

10 from the Future Treatment System to Cal Water's distribution system, including all labor and

11 materials.

12         (5)      Providing traffic controls during all phases of construction of the

13 Future Treatment System, pipelines, and connections to the Future Treatment System necessary

14 to implement the Potential Remedy.

15         (6)      Supplying personnel to supervise and coordinate all phases of

16 construction of the Future Treatment System, pipelines, and connections to the Future Treatment

17 System as specified in the Remedial Design.

18         (7)      Designing and installing controls for each of the Future Remedial

19 Extraction Wells so that the wells will shut down when the pressure exceeds Cal Water's normal

20 operating high-pressure limit in the water distribution system and restart when the pressure is

21 below a minimum water system pressure setting. Cal Water will adjust these pressure settings to

22 give each of the Future Remedial Extraction Wells the pumping priority that has been assigned

23 to that well pursuant to the procedure in section 5.2(b).

24         (A)      DTSC shall provide, at no cost to Cal Water, control

25 equipment for each of the Future Remedial Extraction Wells so that the wells will shut down

26 when the pressure exceeds Cal Water's normal operating high-pressure limit in the water

27 distribution system and restart when the pressure is below a minimum water system pressure

28 setting.

(8)     Procuring and installing fencing at the site of the Future Remedial Extraction Wells and Future Treatment System and, as needed, installing or maintaining a paved driveway at those locations.

(9)     Procuring and installing chlorination equipment, which shall consist of a double contained storage tank, diaphragm metering pump, chlorine analyzer, and chlorine equipment shed.

(b)     <u>Cost Cap</u>

(1)     If Cal Water spends more than $600,000 (six hundred thousand dollars) to undertake the actions listed in section 5.1(a), and DTSC determines that additional actions listed in section 5.1(a) are necessary to the success of the Potential Remedy, DTSC and Cal Water will share the additional expenses equally until the total cost of actions listed in section 5.1(a) reaches $800,000, after which time Cal Water will not be responsible for paying for additional actions listed in section 5.1(a).

(2)     The $600,000 amount described in section 5.1(b)(1) includes the following: Cal Water's actual expenses for the capital improvements described in Section 5.1(a) plus ten percent (10%) overhead on those capital improvements that are direct, non-contract costs to Cal Water; actual expenses for other materials necessary to implement the actions listed in Section 5.1(a); direct labor costs for time spent undertaking the actions listed in Section 5.1(a); and payments to contractors to implement the actions listed in Section 5.1(a). The Cost Cap described in this section 5.1(b) applies only to the activities listed in section 5.1(a), and not to other work required of Cal Water by this Consent Decree.

(3)     Until the actions listed in Section 5.1(a) have been completed, Cal Water shall provide monthly statements to DTSC tracking the costs incurred to date for the labor and capital improvements subject to the cap.

(4)     Cal Water shall maintain accurate books and records such that the costs incurred by Cal Water in undertaking the actions listed in Section 5.1(a) can be ascertained. Such books and records shall be maintained at the General Office of Cal Water and shall be available for inspection and copying by DTSC during the normal business day upon ten (10)

working days written notice, except as to the year end close. Copying shall be at expense of DTSC.

(5) For up to one year after the actions listed in Section 5.1(a) have been completed, DTSC shall have the right at its own expense to have Cal Water's books and records audited by an independent accounting firm or representative, and Cal Water agrees to cooperate fully with DTSC in any such audit. DTSC shall provide Cal Water forty-five (45) calendar days advance notice of an audit and shall not request an audit during the year end close. DTSC shall also have the right to access records submitted by Cal Water to the California Public Utilities Commission ("CPUC") in connection with its reasonableness review of the costs for the subject capital improvements in the applicable general rate case for the Chico District.

(c) Cal Water, in its discretion, shall initially determine if actions to be undertaken pursuant to Section 5.1(a) are to be bid competitively, sole source, or otherwise, or are to be performed by Cal Water employees, subject to DTSC's right to review potential contract awards, described below. Cal Water is not subject to any public works bidding or contract laws by virtue of this Consent Decree.

(1) Cal Water shall review any bids and make recommendations to DTSC for the award of contracts to perform the work specified in Section 5.1(a).

(2) If, after completion of the design phase of the work to be undertaken pursuant to Section 5.1(a), Cal Water receives any costs estimates for the remaining actions required by Section 5.1(a), Cal Water will inform DTSC of the dollar amount of such estimates.

(3) DTSC is entitled to reject a contract award recommended by Cal Water if performance of that contract would cause the total cost of the actions to be undertaken pursuant to Section 5.1(a) by Cal Water to exceed the cost cap described in Section 5.1(b).

(A) In the event that DTSC rejects a contract award recommendation, DTSC and Cal Water shall meet and confer to determine whether the work proposed in the contract should be solicited again or performed in some other manner.

(B)     DTSC's approval of a contract award shall not be unreasonably withheld.  DTSC shall have ten (10) calendar days from receipt to approve or deny a Cal Water contract award recommendation.  DTSC shall consult with Cal Water prior to the denial of any contract award.  Unless DTSC does not approve or otherwise denies a Cal Water contract award recommendation within ten (10) calendar days from receipt of Cal Water's recommendation, Cal Water will deem its contract award recommendation approved and proceed with awarding the contract.

(d)     [RESERVED]

(e)     Cal Water shall not have title to nor ownership interest in the two wells known as Future Well A and Future Well B, any new monitoring wells, nor any wells constructed to replace these wells.  Cal Water shall have title to and ownership of the capital improvements installed at its expense and shall retain ownership of CWS-46.

(f)     Except as to CWS-46, Cal Water shall not be responsible for the payment of real property taxes or pump taxes for the Future Treatment System.  Except as to CWS-46, Cal Water shall not be required to maintain insurance for the Future Treatment System.

(g)     DTSC will give Cal Water the opportunity to review any bids received by DTSC for the construction of any of the Future Remedial Extraction Wells.  Cal Water will consult with DTSC on design of Future Remedial Extraction Wells and any equipment needed to be installed on the Future Treatment System.

5.2     <u>Acceptance of Treated Water from the Future Treatment System</u>.

(a)     Cal Water will accept into its distribution system and deliver to its customers the water treated by the Future Treatment System at its expense for 30 years from the date that this Consent Decree is approved by the Court or for as long as DTSC determines that the Future Treatment System should continue to operate, whichever is shorter.  The quantity of water anticipated but not guaranteed to be produced by the Future Treatment System is 100 gallons per minute, depending upon system conditions and maintenance.  However, Cal Water shall be relieved of this requirement for any period of time during which a regulatory agency of the State or federal government does not permit Cal Water to provide the treated pumped water

(alone or blended with other water) to its domestic water customers, provided that such prohibition is not a result of Cal Water's failure, without substantial justification, to comply with a permit issued to it.

(b)     Cal Water will use its best efforts to continuously (24 hours per day) pump the Future Remedial Extraction Wells and CWS-46 at the rates specified in the Remedial Action Plan. Cal Water will manage its pumping and distribution of water in order to give priority to continuous pumping of the Future Remedial Extraction Wells, CWS-46, and the Central Plume Wells over all other Cal Water wells in Chico such that Cal Water will stop pumping other Cal Water wells in Chico so that the specified wells can continue to pump without exceeding the pressure limits of the distribution system. These pumping requirements are subject to the following:

(1)     Cal Water will be allowed to shut down wells in case of emergency or when necessary to perform routine maintenance, inspections, and repairs.

(2)     Cal Water may pump any Cal Water wells in Chico in contravention of the priority established in section 5.2(b) if such pumping is needed to maintain system pressure to meet customer demand or regulatory requirements.

(3)     [RESERVED]

(4)     No more than once per year, DTSC will inform Cal Water in writing of the pumping priority among each of the Future Remedial Extraction Wells, CWS-46, and the Central Plume Wells. If at any time water distribution system pressure limits do not allow the Future Remedial Extraction Wells, CWS-46, and the Central Plume Wells to all be pumped simultaneously, Cal Water may stop pumping one or more of these wells in the priority order specified by DTSC until such time as system pressure allows one or more of these wells to resume pumping.

(c)     DTSC, at its expense, shall equip each of the Future Remedial Extraction Wells with a chart recorder that will record flow rate and water system pressure. DTSC, at its expense, shall equip the Future Remedial Extraction Wells with a totalizing flow meter. Cal

1  Water shall report to DTSC each month the monthly total output of each of the Future Remedial

2  Extraction Wells and CWS-46.

3      (d)     Under no circumstances is Cal Water required to manage the treated

4  water at its expense in a manner other than by delivering water to its customers.

5      (e)     Cal Water is not required to pay any user fees for the acceptance of the

6  treated water from the Future Remedial Extraction Wells during the time that it is providing at

7  its own expense the services described in section 5.3.

8      (f)     Cal Water shall use its best efforts to obtain from DHS or any other

9  applicable regulatory agency a permit allowing it to deliver the treated water from the Future

10 Treatment System to its customers.  These efforts shall include collecting and providing

11 necessary data, preparing application documents, supplying maps and diagrams, responding to

12 inquiries from regulators, and implementing at its expense the 12-step process set forth in the

13 DHS letter of February 17, 2006, to Cal Water.  (The letter and DHS's "Policy Memo 97-005

14 Policy Guidance for Direct Domestic Use of Extremely Impaired Sources" are attached hereto

15 as Exhibit G.)  Cal Water shall not be responsible for the costs, including attorney's fees and

16 engineering or environmental consultant's fees, associated with the preparation and approval of

17 an environmental impact report (EIR), if required for the Future Treatment System and/or the

18 Future Remedial Extraction Wells.

19         (1)     Denial or revocation of a permit by DHS or any other applicable

20 regulatory agency that results in the inability of Cal Water to legally provide the treated water to

21 its domestic water customers shall not constitute a violation of this Consent Decree, unless the

22 denial or revocation is due to Cal Water's failure, without substantial justification, to comply

23 with the procedural requirements of or requests for information from the regulatory agency.  Cal

24 Water shall have a reasonable opportunity to cure said denial or revocation after written notice

25 thereof before it is deemed a violation of this Consent Decree.

26      (g)     Cal Water shall remain in compliance with all applicable statutes,

27 regulations, and permits, including permits issued by DHS, which allow it to deliver treated

28 water from the Future Treatment System to its domestic water customers.

5.3    Ongoing Operations and Maintenance of the Future Treatment System.

Starting on the Effective Date and ending on the day 30 years subsequent thereto, or when DTSC has determined that the remediation is complete, whichever is earlier, Cal Water will, at its expense, perform the work specified below to operate and maintain the Future Treatment System, Future Remedial Extraction Wells, and associated equipment and pipelines:

(a)    Pump the Future Remedial Extraction Wells as described in section 5.2. Costs to be borne by Cal Water are as follows:

(1)    Power used to pump the Future Remedial Extraction Wells and operate the Future Treatment System;

(a)    However, if the Remedial Action Plan requires the Future Remedial Extraction Wells to be pumped at a rate significantly in excess of 100 gallons per minute, Cal Water shall only be required to bear the cost of power that would be needed to pump the Future Remedial Extraction Wells at 100 gallons per minute.

(2)    Other utilities, such as telephone, necessary for the operation of the Future Remedial Extraction Wells and Future Treatment System;

(b)    Cal Water shall maintain the Future Remedial Extraction Wells. Maintenance includes leak repair, adjustment and repair of pump lubrication equipment and flow meter equipment, chart replacement, site inspection, and other maintenance necessary for operation of pumps, motors, and electrical equipment, as Cal Water determines is needed.

(1)    Cal Water shall not be responsible for the cost of replacement parts for the Future Remedial Extraction Wells, provided that the need to replace said parts is from causes beyond the reasonable control of Cal Water, due to normal wear and tear, or end of expected useful life.

(2)    Cal Water shall not be responsible for the cost of disposing of raw water from the Future Remedial Extraction Wells that cannot be conveyed to its distribution system.

(c)    Cal Water shall perform maintenance of the Future Treatment System. Maintenance includes leak repair, adjustment and repair of equipment, chart replacement, site

inspection, pre-filter replacement, coordination and supervision of replacement of carbon filter media, and other maintenance necessary for operation of the Future Treatment System, as Cal Water determines is needed.

(1)     Cal Water shall not be responsible for the cost of replacement parts for the Future Treatment System, provided that the need to replace said parts is from causes beyond the reasonable control of Cal Water, due to normal wear and tear, or end of expected useful life.  If the selected treatment technology changes, Cal Water likewise shall not be responsible for costs of replacements parts for the new technology.

(2)     After it provides the initial supply of carbon filter media for the Future Treatment System, Cal Water shall not be responsible for the cost of carbon filter media used to treat water passing through the Future Treatment System.  Cal Water shall not be responsible for the cost of carbon filter media after the initial supply of said media..

(d)     Cal Water shall apply for and obtain any permits or permit amendments or renewals necessary for the continued operation of the Future Treatment System and Future Remedial Extraction Wells, including paying any permitting or regulatory fees necessary for the legal operation of the Future Treatment System and Future Remedial Extraction Wells.  Cal Water shall not be responsible for the costs, including attorney's fees and engineering or environmental consultant's fees, associated with the preparation and approval of an environmental impact report (EIR), if required for the Future Treatment System and/or the Future Remedial Extraction Wells. Cal Water also shall not be responsible for the costs, including attorney's fees and environmental consultant's fees, for any agency approvals or permits required for a creek crossing or streambed alteration associated with the Future Treatment System and/or the Future Remedial Extraction Wells, including, but not limited to, approvals or permits needed from the California Department of Fish and Game or the National Oceanic and Atmospheric Administration.

(e)     Cal Water shall remain in compliance with all applicable statutes, regulations, and permits, including permits issued by DHS, with respect to the work to be performed pursuant to Section 5.3.

(f)     Cal Water will perform at its expense sampling and analysis, using method

EPA standard 8260B or equivalent, once per month, or similar sampling as need to meet DHS monitoring requirements, of water extracted and treated as part of the Potential Remedy, and report those results to DTSC on a monthly basis. Changes to the monitoring protocols may be made with the prior written approval of DTSC. The water to be sampled is as follows:

(1)     Water that has been treated by one of the granular activated carbon units at the Future Treatment System prior to entry of that water into the second granular activated carbon unit at the Future Treatment System;

(2)     Treated water that exits the Future Treatment System after passing through both granular activated carbon units;

(3)     Raw, untreated water extracted from each of the two Future Remedial Extraction Wells.

(g)     Cal Water will perform at its expense any sampling and analysis of water at the time carbon in the Future Treatment System is changed or replaced, if such sampling and analysis is required by DHS or other governmental agency regulating drinking water. In addition, Cal Water will perform Title 22 Sampling and the annual water monitoring analyses required by DHS.

(h)     Cal Water is not responsible for the cost of any sampling or analysis of groundwater monitoring wells, including, but not limited to, well purging, sample collection, analytical costs, data analysis, hazardous waste disposal fees, or temporary storage.

(i)     Cal Water shall make reasonable efforts to obtain access to the Future Remedial Extraction Wells and Future Treatment System and associated equipment and pipelines necessary to carry out the activities described in this section 5.3. Consideration, payments, costs or expenses, including attorney's fees, related to the acquisition of real property, eminent domain, licenses, leases, easements, construction easements, rights of entry or access rights shall not be borne by Cal Water.

(j)     If it becomes technically infeasible for Cal Water to operate the Future Remedial Extraction Wells solely with granular activated carbon absorption because contaminants

other than PCE are detected in the well and/or because the allowable technology changes, Cal Water shall not be responsible for the costs of any new or added treatment technology.

(k)     If Cal Water is unable to legally accept into its distribution system and deliver to it customers the water treated by the Future Treatment System as a result of the failure of DTSC or any other party to replace the carbon filter media used by the Future Treatment System, Cal Water shall not be required to comply with sections 5.2(a), 5.2(b) (with respect only to the Future Treatment System), 5.2(f), 5.3(a), 5.3(c), and 5.3(d) of this Consent Decree until the carbon filter media has been replaced and Cal Water is legally able to accept the water into its distribution system and deliver the water to it customers.

5.4     Operation of Well CWS-46.

Cal Water shall operate at its expense CWS-46 for 30 years or until DTSC has determined that the clean-up performance goals specified in the Remedial Action Plan have been achieved, whichever is earlier.

(a)     In operating the well Cal Water will perform, at its expense, the following activities:

(1)     Pump CWS-46.  Subject to the limitations described in section 5.2(b), Cal Water shall pump well CWS-46 as near to continuously as possible.

(2)     Accept into its distribution system and deliver to its customers the pumped water at its expense.  Cal Water shall be relieved of this requirement for any period of time during which a regulatory agency of the State or federal government prohibits Cal Water from providing the pumped water to its domestic water customers, provided that such prohibition is not a result of Cal Water's failure, without substantial justification, to comply with a permit issued to it or failure to use available cost-effective technology to remove contaminants from the water pumped by the well.

(3)     Monitor water extracted from well CWS-46 by collecting influent and effluent samples each month, analyzing them for volatile organic compounds, and reporting the results of such analyses to DTSC monthly.  Changes to the monitoring protocols may be made with the prior written approval of DTSC.

(4)     Apply for and obtain any permits, permit amendments or renewals necessary for the continued operation of well CWS-46, including paying any permitting or regulatory fees necessary for the legal operation of this well, and remain in compliance with all applicable regulations and permits, including permits issued by DHS, with respect to the work to be performed pursuant to this Section 5.4.

(A)     Denial or revocation of a permit by DHS or any other applicable regulatory agency that results in the inability of Cal Water to legally provide the treated water from CWS-46 to its domestic water customers shall constitute a violation of this Consent Decree, if and only if the denial or revocation is due to Cal Water's failure, without substantial justification, to comply with the procedural requirements of or requests for information from the regulatory agency. Cal Water shall have a reasonable opportunity to cure said denial or revocation after written notice thereof before it is deemed a violation of this Consent Decree.

(5)     Perform maintenance of wells CWS-46 and associated equipment and pipelines, including providing and installing replacement parts and replacing carbon or other water treatment media.

(b)     If Cal Water determines that it is technically infeasible to operate CWS-46 due to the physical condition of the well boring or casing or due to geological conditions, the following procedures shall apply:

(1)     Cal Water shall meet and confer with DTSC about the condition of the well, potential remedies to correct the condition causing the technical infeasibility, and whether operation of the well is needed to achieve the goals of the Remedial Action Plan.

(2)     If DTSC determines that operation of the well is still needed to achieve the goals of the Remedial Action Plan, then DTSC may choose one or more of the following actions:

(A)     Cal Water will rehabilitate the well at its own expense if rehabilitation is technically reasonable.

(B)     Cal Water will install a replacement well at its own expense to take the place of the well to be taken out of service if the replacement well can be installed on the same piece of property as the well to be taken out of service.

(C)     Cal Water will install a replacement well at its own expense to take the place of the well to be taken out of service on a parcel of land obtained by DTSC if the replacement well cannot be installed on the same piece of property as the well to be taken out of service.

(3)     Cal Water is not obligated by this Consent Decree to acquire any real property, by payment of consideration or through the exercise of eminent domain, for the purpose of installing a well to replace CWS-46. Cal Water is not obligated by this Consent Decree to re-install a well more than one time nor to rehabilitate a well more than one time.

(c)     If it becomes technically infeasible for Cal Water to operate CWS-46 solely with granular activated carbon absorption because contaminants other than PCE are detected in the well and/or because the allowable treatment technology changes, the following procedures shall apply:

(1)     Cal Water shall meet and confer with DTSC about the contaminant levels in the well, potential treatment technologies, and whether operation of the well is needed to achieve the goals of the Remedial Action Plan.

(2)     If DTSC determines that operation of the well is still needed to achieve the goals of the Remedial Action Plan, then DTSC has the option of providing additional treatment technology for the well, at no expense to Cal Water, such that the well can continue to operate legally. The provision of additional treatment technology by DTSC does not relieve Cal Water of its obligations to operate any granular activated carbon absorption treatment system at well CWS-46, unless such operation would be superfluous or technically unsound.

(3)     If neither DTSC nor Cal Water chooses to provide new treatment technology for the well, then the procedure in section 5.4(e) shall apply.

(d)     Cal Water shall operate any well installed to replace CWS-46 according to terms of this Consent Decree applicable to the original well.

(e)     If for any reason CWS-46 becomes permanently inoperable, Cal Water shall immediately decommission the well pursuant to a work plan submitted to and approved by DTSC. Notwithstanding the foregoing, Cal Water may take CWS-46 off-line for repairs, rehabilitation, maintenance, peaking or due to system conditions described in section 5.2(b).

(f)     Other than as specified in this section 5.4, nothing in this Consent Decree obligates DTSC to pay for or reimburse Cal Water for the activities listed in section 5.4.

5.5     Cal Water shall conduct all activities required by this Consent Decree in compliance with all applicable state, local and federal requirements including, but not limited to, requirements to obtain permits and to assure worker safety as set forth above.  Cal Water shall also comply with all applicable or relevant and appropriate requirements of all Federal and state environmental laws to be set forth in Remedial Action Plan.  The activities conducted by Cal Water pursuant to this Consent Decree, if consistent with a Remedial Action Plan approved by DTSC, shall be considered to be consistent with California Health and Safety Code section 25356.1.5.

5.6     If the Remedial Action Plan states that activities being performed or to be performed by Cal Water pursuant to any portions of section 5 are inconsistent with the selected remedy for the Southwest Chico Plume, then Cal Water shall not be required by this Consent Decree to perform those activities that the Remedial Action Plan explicitly identifies and states are inconsistent with the remedy selected by the Remedial Action Plan.

5.7     The conveyance by Cal Water of any interest in property, including but not limited to pipelines, pumping equipment, or treatment facilities, shall not release or otherwise affect Cal Water's responsibilities to perform the work specified in section 5, except that:

(a)     If at any time Cal Water is no longer the public water purveyor for the city of Chico, Cal Water may arrange with the successor water purveyor for the city of Chico, or, subject to DTSC approval, with another entity of its choosing, to complete the obligations of Cal Water to perform work under the terms of this Consent Decree; and

(b)     If, as a result of an exercise of eminent domain by a public entity, Cal Water property necessary for complying with the terms of this Consent Decree, including but not limited to pipelines, pumping equipment, or treatment facilities, is condemned and no longer in Cal Water's possession, then Cal Water's responsibilities, if any, to perform the work specified in section 5 will be based on applicable eminent domain law at the time of condemnation.

5.8    Unless otherwise specified, nothing in this Consent Decree obligates DTSC to pay for or reimburse Cal Water for any of the activities listed in section 5. Nothing in this Consent Decree prohibits or in any way limits Cal Water from seeking and obtaining reimbursement for any of the activities listed in section 5, except from DTSC.

5.9    If requested by Cal Water with reasonable notice, DTSC will provide information or testimony to the California Public Utilities Commission to explain the nature and necessity of the work being performed by Cal Water pursuant to this Consent Decree.

5.10    Cal Water shall not be held liable or deemed to have breached this Consent Decree for failure or delay caused by or resulting from causes beyond its reasonable control, including, but not limited to, fire, floods or other extreme weather conditions, earthquakes, acts of terrorism, acts of war, civil disturbances, acts of God, labor disturbances, embargoes, or delays in acting by any governmental authority.

(a)    Cal Water shall not be held responsible for removing such failures or delays unless:

(1)    The failures or delays result from causes within Cal Water's control; or

(2)    The failures or delays affect property owned by Cal Water, but only to the extent the failures or delays affect such property.

(b)    This paragraph is intended only to suspend and not discharge obligations under this Consent Decree. When the causes of the failure or delay are removed, performance shall resume by Cal Water.

5.11    Within 10 days of the effective date of this Consent Decree, Cal Water and DTSC shall each designate an individual to serve as a contact and liaison for the work described in section 5.

**6.    GOVERNMENT LIABILITIES**

Neither DTSC nor any other department or agency of the State of California shall be liable for any injuries or damages to persons or property resulting from acts or omissions by Cal Water in carrying out activities pursuant to this Consent Decree.  Neither DTSC nor any other department or agency of the State of California shall be held as a party to any contract entered into by Cal Water or its agents in carrying out activities pursuant to this Consent Decree unless the contract is entered into in writing by DTSC or such other department or agency of the State of California.

**7.    COVENANT NOT TO SUE BY DTSC**

7.1    Except as specifically provided in sections 7.2 and 8, below, and except as may be necessary to enforce the terms of this Consent Decree, as of the date this Consent Decree is entered as a consent decree of the Court, DTSC covenants not to sue Cal Water for "Matters Addressed" by this Consent Decree.  "Matters Addressed" includes any and all civil liability for reimbursement of all or any portion of DTSC's Response Costs, past or future, declaratory relief, injunctive relief or any other relief under CERCLA, the Carpenter-Presley-Tanner Hazardous Substance Account Act, California Health & Safety Code §§ 25300 et seq., or any other applicable federal or state statutory or common law for liability for Response Costs and/or response actions, with regard to releases or threatened releases of perchloroethylene (including its breakdown products) at, in, or from the Southwest Chico Plume, as set forth in the Complaint.

7.2    "Matters Addressed" shall not include, and the covenant not to sue set forth in section 7.1 above does not pertain to, any matters other than those expressly specified in section 7.1.  DTSC reserves, and this Consent Decree is without prejudice to, all rights, claims and causes of action DTSC may have against Cal Water with respect to all other matters, including releases or threatened releases of hazardous substances in the city of Chico other than releases or

threatened releases of perchloroethylene (including its breakdown products) at, in, or from the Southwest Chico Plume.

7.3    DTSC further covenants not to sue Cal Water for reimbursement of all or any portion of DTSC's Response Costs, past or future, declaratory relief, injunctive relief or any other relief under CERCLA, the Carpenter-Presley-Tanner Hazardous Substance Account Act, California Health & Safety Code §§ 25300 et seq., or any other applicable federal or state statutory or common law for liability for Response Costs and/or response actions with respect to work being performed by Cal Water in compliance with this Consent Decree, including but not limited to the pumping or not pumping of well CWS-46 (or another well that replaces said well) done in compliance with this Consent Decree.

## 8.    RESERVATION OF RIGHTS

8.1    The Covenant Not to Sue set forth in section 7.1 above does not pertain to the following matters, which DTSC reserves, and this Consent Decree is without prejudice to all rights and claims of DTSC against Cal Water with respect to the following:

(a)    material failure of Cal Water to meet the requirements of this Consent Decree;

(b)    damage to natural resources, as defined in Section 101(6) of CERCLA, 42 U.S.C. section 9601(6), including all costs incurred by any natural resources trustees; and

(c)    criminal liability.

8.2    Except as expressly provided in this Consent Decree, nothing in this Consent Decree is intended nor shall it be construed to preclude DTSC from exercising its authority under any law, statute or regulation.  Furthermore, nothing in this Consent Decree is intended, nor shall it be construed, to preclude any other state agency, department, board or entity or any federal entity from exercising its authority under any law, statute or regulation.

## 9.    COVENANT NOT TO SUE BY CAL WATER

9.1    Cal Water covenants not to sue, and agrees not to assert any claims or causes of action against, DTSC, or its contractors or employees, for any costs or damages Cal Water might incur or for any injuries or losses Cal Water might suffer as a result of its performance of the

1 requirements of this Consent Decree.

2 9.2 Cal Water further covenants not to sue, and agrees not to assert any claims or

3 causes of action (including those previously identified in any counterclaims filed by Cal Water)

4 under CERCLA, the Carpenter-Presley-Tanner Hazardous Substance Account Act, California

5 Health & Safety Code §§ 25300 et seq., or any other applicable federal or state statutory or

6 common law, against, DTSC or its contractors or employees, arising from any costs Cal Water

7 has incurred, or may incur in the future, conducting removal or remedial activities, including

8 operation and maintenance activities, at and for the Southwest Chico Plume.

9 9.3 Nothing in this section 9 prohibits Cal Water from taking such action as is

10 necessary to enforce the provisions, terms, or conditions of this Consent Decree.

11 **10. EFFECT OF CONSENT DECREE**

12 10.1 This Consent Decree constitutes the resolution of Cal Water's liability to DTSC

13 with respect to the Matters Addressed in a judicially approved settlement within the meaning of

14 section 113(f)(2) of CERCLA, 42 U.S.C. section 9613(f)(2). This Consent Decree requires Cal

15 Water to perform various activities in connection with the remediation of the hazardous

16 substances released at, in, or from the Southwest Chico Plume.

17 10.2 Accordingly, upon entry of this Consent Decree as a consent decree of the Court,

18 and provided that Cal Water performs all of its obligations under this Consent Decree, Cal Water

19 shall be entitled, as of the Effective Date, to protection against all claims for contribution,

20 pursuant to section 113(f)(2) of CERCLA, 42 U.S.C. section 9613(f)(2), for the Matters

21 Addressed by this Consent Decree (as described in section 7), to the fullest extent permitted by

22 law, and by entering this Consent Decree this Court makes a determination pursuant to

23 California Code of Civil Procedure section 877.6 that the settlement was made in good faith and

24 shall bar any other joint tortfeasor or co-obligor from any further claims against the settling

25 tortfeasor or co-obligor (Cal Water) for equitable comparative contribution, or partial or

26 comparative indemnity, based on comparative negligence or comparative fault.

27 10.3 Except as specifically provided in this Consent Decree, nothing in this Consent

28 Decree is intended, nor shall be construed, to waive, release, or otherwise affect any right, claim,

or cause of action held by any party to this Consent Decree against, or to provide a covenant not to sue to, any third person not a party to this Consent Decree, or to in any way limit, restrict, or impair the right of any party to this Consent Decree to assert rights, claims, causes of actions, and defenses against any third person not a party to this Consent Decree, including without limitation, the right to seek payment, reimbursement, contribution, or indemnity from such persons for obligations incurred or to be incurred, or actions taken or to be taken, under this Consent Decree. Except as specifically provided in this Consent Decree, DTSC and Cal Water expressly reserve any rights, claims, or causes of actions they might have against any third person not a party to this Consent Decree.

10.4    This Consent Decree is contingent and dependent on all of its terms being approved and ordered by the Court. If the Court does not approve and order this Consent Decree, DTSC and Cal Water reserve all of their respective rights, remedies, and defenses.

10.5    This Consent Decree is not intended, nor shall it be construed, to limit or otherwise affect DTSC's right to select a remedial action for the Southwest Chico Plume that is different from or inconsistent with the Potential Remedy.

10.6    By agreeing to the terms of this Consent Decree, including but not limited to the statement of work to be performed by Cal Water, Cal Water does not warrant, promise, represent or guarantee that any of the actions taken by Cal Water will remediate or have any effect upon contamination in the Southwest Chico Plume.

10.7    Nothing in this Consent Decree obligates DTSC to perform, implement, or pay for any work specified in the Remedial Action Plan or included in the definition of the Potential Remedy, to clean up or remediate contaminated groundwater, or to provide treated or uncontaminated water to Cal Water. This Consent Decree does not create a cause of action against DTSC for any failure by DTSC to perform, implement, or pay for any work specified in the Remedial Action Plan or included in the definition of the Potential Remedy, to clean up or remediate contaminated groundwater, or to provide treated or uncontaminated water to Cal Water.

## 11.    RETENTION OF RECORDS

11.1    Cal Water shall provide to DTSC, upon request, copies of all documents and information within its possession or control or that of their contractors or agents relating to the implementation of this Consent Decree, including, but not limited to design specifications, reports of construction activities, contracts, invoices, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, and correspondence. Such records shall be preserved by Cal Water until 10 years after the entry of this Consent Decree, or 10 years after creation of a record or document, whichever is later.

11.2    Cal Water may assert that certain documents, records, and other information requested by DTSC under section 11.1 are privileged under the attorney-client privilege or any other privilege recognized by law.  If Cal Water asserts such a privilege, it shall provide DTSC with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient of the document, record, or information; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by Cal Water.  However, no documents, records, or other information created or generated pursuant to the requirements of the Consent Decree shall be withheld on the grounds that they are privileged.  If a claim of privilege applies only to a portion of a document, the document shall be provided to DTSC in redacted form to mask the privileged information only.  Cal Water shall retain all records and documents it claims to be privileged until DTSC has had a reasonable opportunity to dispute the privilege claim and any such dispute has been resolved in Cal Water's favor.

11.3    DTSC shall retain records relating to the implementation of this Consent Decree in accordance with the requirements of the State Records Management Act (California Government Code, §§ 14740-14774) and related implementing regulations and policies.  DTSC shall make such records available to Cal Water upon request in accordance with the terms of the California Public Records Act (California Government Code, §§ 6250 et seq.).

**12.    NOTIFICATION**

12.1.    Notification to or communication between the parties to this Consent Decree as

required or provided for in this Consent Decree shall be addressed as follows (except that

monitoring data required to be sent to DTSC pursuant to section 5 shall be sent only to

Mr. Tjosvold):

As to DTSC:

James Tjosvold
Chief, Northern California Central Cleanup Operations Branch
Department of Toxic Substances Control
8800 Cal Center Drive
Sacramento, CA 95826-3200
Attn: Donald Mandel, Project Manager for Southwest Chico Plume
facsimile: (916) 255-3696

Judith Tracy, Esq.
Office of Legal Counsel
Department of Toxic Substances Control
1001 "I" Street
P.O. Box 806
Sacramento, CA 95812
facsimile: (916) 323-5542

Timothy E. Sullivan, Esq.
Deputy Attorney General
California Department of Justice
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
facsimile: (510) 622-2270

As to Cal Water:

Lynne McGhee
Corporate Counsel
California Water Service Company, Inc.
1720 North First Street
San Jose, CA. 95112-4598
facsimile:

Patrick D. Riddle
Paul D. Sheldon
Law Offices of Patrick D. Riddle
1811 Grand Canal Blvd., Suite 2
Stockton, CA 95207
facsimile: (209) 367-6997

12.2.   Upon 10 days notice to the other party, a party to this Consent Decree may

substitute another person for an addressee named above to receive notifications or

communications as required or provided for in this Consent Decree.

**13.    MODIFICATION OF SETTLEMENT AGREEMENT AND CONSENT DECREE**

This Consent Decree may only be modified upon the written agreement of DTSC and Cal Water and the approval of the Court, or upon order of the Court after noticed motion by a party to this Consent Decree.

**14.    APPLICATION OF CONSENT DECREE**

This Consent Decree shall apply to and be binding upon DTSC, Cal Water, and each of their respective successors and assigns. The provisions of this Consent Decree shall inure to the benefit of DTSC, Cal Water, and each of their respective successors and assigns. The provisions of this Consent Decree shall also inure to the benefit of the officers, directors, employees and agents, attorneys, and affiliates of Cal Water, in their capacities as such, and to Cal Water's parent and subsidiary companies, including but not limited to California Water Service Group.

**15.    AUTHORITY TO ENTER**

Each signatory to this Consent Decree certifies that he or she is fully authorized by the party he or she represents to enter into this Consent Decree, to execute it on behalf of the party represented, and legally to bind that party.

**16.    INTEGRATION**

This Consent Decree, including the exhibits and other materials incorporated herein by reference, constitutes the entire agreement between DTSC and Cal Water and may not be amended or supplemented except as provided for in this Consent Decree.

**17.    RETENTION OF JURISDICTION**

The Court shall retain jurisdiction of this matter for the purpose of enforcing the terms of this Consent Decree.

**18.    EXECUTION OF DECREE**

This Consent Decree may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**19.    INTERPRETATION**

California law governs the interpretation of this Consent Decree. This Consent Decree shall be deemed to have been drafted equally by all parties hereto.

**20.    DISPUTE RESOLUTION**

20.1    The dispute resolution process described in this section is limited to disputes relating to the scope, nature, or duration of work to be performed by Cal Water or DTSC pursuant to the Consent Decree.

20.2    DTSC and Cal Water agree that they will make good faith efforts to informally resolve any disputes as to the scope, nature, or duration of work to be performed by Cal Water pursuant to the Consent Decree.  Such efforts shall include written or oral communications between employees of Cal Water and DTSC to discuss the nature of the dispute and means of resolving the dispute.

20.3    If a dispute remains after informal attempts at resolution, DTSC or Cal Water may request to the other party in writing that the parties employ a mediator to help resolve the dispute.  Mediation is not required by this Consent Decree and must be agreed upon by both parties.  The role of the mediator will be solely to facilitate discussions and help the parties resolve the dispute on terms agreeable to both parties.  The mediator will not have the power to issue rulings on the meaning of the Consent Decree nor to make decisions binding on the parties.  DTSC and Cal Water will share equally in the cost of the mediation, and each party shall pay its own fees and costs.  DTSC and Cal Water agree that the mediation described in this section shall be conducted by Martin Quinn, or by such other person as both parties agree upon.

20.4    Any dispute not resolved through the dispute resolution process described in this section may be raised to the U.S. District Court for the Eastern District of California for resolution.

20.5    Notwithstanding the invocation of the dispute resolution procedures set forth in this section, Cal Water shall continue to perform all of its obligations under this Consent Decree that are not substantially in dispute or at issue.

**21.    ATTORNEYS FEES AND COSTS**

As to each other, each party to this Consent Decree shall bear its own costs, attorneys' fees, expert witness fees, and all other costs of litigation.  This paragraph shall have no effect on the parties' right to recover these fees or costs from any other party.

**22.    APPROVALS OF PARTIES**

Plaintiff DTSC consents to this Consent Decree by its authorized representative as follows:

CALIFORNIA DEPARTMENT OF
TOXIC SUBSTANCES CONTROL

Dated: __7/3/07_____          /s/

James Tjosvold
Chief, Northern California-Central Cleanup
  Operations Branch
California Department of Toxic Substances Control

Cal Water consents to this Consent Decree by its authorized representative as follows:

CALIFORNIA WATER SERVICE COMPANY,
  INC.

Dated: _____          By:

                                        Its:

APPROVED AS TO FORM:

DATED: __7/12/07_____          EDMUND G. BROWN JR.
                                        Attorney General of the State of California
                                        TOM GREENE
                                          Chief Assistant Attorney General
                                        THEODORA BERGER
                                          Senior Assistant Attorney General
                                        SALLY KNOX
                                          Supervising Deputy Attorney General
                                        CHRISTOPHER CROOK
                                        KIRK McINNIS
                                        Deputy Attorneys General


                                        /s/_____
                                        TIMOTHY E. SULLIVAN
                                        Deputy Attorney General
                                        Attorneys for Plaintiff
                                        CALIFORNIA DEPARTMENT OF TOXIC
                                        SUBSTANCES CONTROL

DATED: __7/13/07_____          LAW OFFICES OF PATRICK D. RIDDLE


                                        /s/_____

PAUL D. SHELDON
Attorneys for Defendant
CALIFORNIA WATER SERVICE COMPANY

**IT IS SO ORDERED, ADJUDGED AND DECREED:**

Dated:    August 14, 2007.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT